1                        UNITED STATES DISTRICT COURT
                         NORTHERN DISTRICT OF OHIO
2                              EASTERN DIVISION

3

4    IN RE:  SUBOXONE              ) Case No. 1:24-md-3092
     (BUPRENORPHINE/NALOXONE)      )
5    FILM PRODUCTS LIABILITY       ) MDL No. 3092
     LITIGATION                    )
6                                  ) Thursday, June 6, 2024

7

8                                  - - -

9

10             TRANSCRIPT OF STATUS CONFERENCE PROCEEDINGS

11              BEFORE THE HONORABLE J. PHILIP CALABRESE

12                    UNITED STATES DISTRICT JUDGE

13                                 - - -

14

15

16

17

18

19

20   Official Court Reporter:   Donnalee Cotone
                                United States District Court
21                              801 West Superior Avenue
                                Court Reporters 7-189
22                              Cleveland, Ohio 44113
                                216.357.7036
23                              Donnalee_Cotone@ohnd.uscourts.gov

24

25        Proceedings recorded by mechanical stenography; transcript
               produced with computer-aided transcription.

 1    APPEARANCES:

 2    For the Plaintiffs:

 3

 4            **Ashlie Case Sletvold, Esq.**
               PEIFFER WOLF CARR KANE CONWAY & WISE
               6370 SOM Center Road, Suite 108
 5            Cleveland, OH 44139
               216.589.9280
 6

 7            **Erin K. Copeland, Esq.**
               FIBICH LEEBRON COPELAND BRIGGS JOSEPHSON
 8            1150 Bissonnet Street
               Houston, TX 77009
 9            713.751.0025

10

11            **Timothy J. Becker, Esq.**
               JOHNSON BECKER
               444 Cedar Street, Suite 1800
12            St. Paul, MN 55101
               612.436.1800

13

14            **Trent B. Miracle, Esq.**
               FLINT COOPER
15            222 East Park Street, Suite 500
               Edwardsville, IL 62025
16            618.288.4777

17

      For the Plaintiffs' Executive Committee:
18

19            **Alyson Beridon, Esq.**
               HERZFELD, SUETHOLZ, GASTEL, LENISKI & WALL
20            600 Vine Street, Suite 2720
               Cincinnati, OH 45202
21            513.381.2224

22

23

24

25

APPEARANCES (continued):

For Defendants Indivior, Inc.; Indivior Solutions, Inc.;
Indivior PLC; Aquestive Therapeutics, Inc.; Reckitt
Benckiser LLC; and Reckitt Benckiser Healthcare (UK) Ltd.:

       **Denise A. Dickerson, Esq.**
       SUTTER O'CONNELL
       1301 East Ninth Street, 3600 Erieview Tower
       Cleveland, OH 44114
       216.928.2200

       **Katherine E. Bell-Moss, Esq.**
       **Mary Renee Pawelek, Esq.**
       **Randall L. Christian, Esq.**
       BOWMAN & BROOKE
       2901 Via Fortuna Drive, Suite 500
       Austin, TX 78746
       512.874.3804

| | | |
|---|---|---|
| | 1 | MORNING SESSION, Thursday, June 6, 2024 |
| | 2 | (Proceedings commenced at 10:06 a.m.) |
| | 3 | - - - |
| | 4 | COURTROOM DEPUTY: All rise. |
| 10:07:45 | 5 | THE COURT: Please be seated. |
| | 6 | Well, good morning, everyone. |
| | 7 | This is MDL number 3092, Case Number 1:24-md-3092. |
| | 8 | In the interest of time, I have the attendance sheet, |
| | 9 | which I'll include in the minutes, so I don't think we need |
| 10:08:38 | 10 | to go through all the appearances. |
| | 11 | But there's a few items of business today. I think |
| | 12 | the primary one is argument on the proposal from the |
| | 13 | defendants about phasing discovery. |
| | 14 | So, Mr. Christian, it's your motion. Happy to hear |
| 10:08:56 | 15 | from you first. |
| | 16 | MR. CHRISTIAN: Thank you very much, |
| | 17 | Your Honor. Good morning. |
| | 18 | I have some slides that I'll be -- I have a hard copy |
| | 19 | if Your Honor would like a hard copy. |
| 10:09:10 | 20 | THE COURT: Sure. Why don't you pass that up. |
| | 21 | MR. CHRISTIAN: If it's okay with the Court, |
| | 22 | I'll stand here so I will be able to see the slides. |
| | 23 | Is that fine? |
| | 24 | All right. May it please the Court. Randall |
| 10:09:46 | 25 | Christian on behalf of Indivior, Inc. |

1          Thank you, you know, for allowing us to talk about our

2    proposal today.

3          There's no question in these cases that the plaintiffs

4    bear the burden of proof to show that Suboxone film can

10:10:00  5    cause dental adverse events that they are alleging in these

6    cases.

7          There's also no question that the issue of general

8    causation applies to every case in this MDL.  If the

9    plaintiffs are unable to meet that burden, that will be

10:10:13 10   dispositive to this MDL.

11          Now, it's Indivior's position that the general

12   causation evidence here is extremely weak and legally

13   insufficient.  But we're not here today to decide that.

14   We're here to decide whether or not this MDL will go down

10:10:29 15   the road of phase discovery focusing on general causation.

16          So what are the dental injuries that are being alleged

17   in this case?  It's a little bit difficult to decipher from

18   the complaints that have been filed so far.  But in

19   communications with plaintiffs' counsel, prior hearings,

10:10:47 20   other briefings, the focus appears to be on plaintiffs who

21   are alleging dental caries and resulting tooth loss.

22          So with that in mind, the specific question, and the

23   burden that the plaintiffs have, is there scientific

24   reliable evidence to demonstrate that Suboxone film can

10:11:08 25   cause dental caries and resulting tooth loss?

1          That task, that burden that they have, is specific to

2     Suboxone film, a product that is indicated for single daily

3     dosage, and a product that is put into the mouth and

4     dissolved within 2 to 3 minutes.

10:11:25 5          So we think there are major obstacles to the

6     plaintiffs being able to show general causation with respect

7     to Suboxone film.  What of some of those major obstacles?

8          Number one, with respect to dental caries, we're

9     talking about the most widespread disease in the entire

10:11:43 10     world.  It applies to almost every adult.  So we're not

11     talking about some rare condition or a -- something specific

12     signature disease like aortic valve regurgitation with

13     fen-phen.  This is something that affects everyone.  We

14     think that will make it difficult.

10:12:03 15          It's also unquestionable that there are multiple

16     causes and contributing factors to dental caries, as you can

17     see from this chart, that all different things that lead to

18     someone having dental caries.  And one of those issues there

19     is time.  What we hear from the dental experts, what we see

10:12:19 20     in the textbooks, what we hear from dental researchers, that

21     when you do a clinical study studying caries, you got to

22     carry that study out for two years minimum to be able to

23     identify because it takes that long of a time from beginning

24     to diagnosis of a dental carie.

10:12:33 25          And a another major obstacle is that the plaintiffs in

1    this MDL come alleging dental caries result in tooth loss

2    from a condition that they are prescribed this drug for.

3    Opioid dependence or opioid use disorder unquestionably have

4    a high history of prior dental caries and tooth loss and are

10:12:57  5    at a higher risk.

6         So that is something else that the plaintiffs will

7    have to overcome and deal with with people that are already

8    having dental caries and tooth loss from the opioid use

9    disorder.  This is undisputed.  So there are multiple

10:13:07  10    randomized control trials that show this.  And this is a

11    study that the FDA cited in their drug safety communication.

12         So in this context, Your Honor, we have a highly

13    prevalent disease that takes -- has multiple causes, takes

14    years to develop in a population of people who already have

10:13:29  15    dental caries and tooth loss.  In that scenario, you're

16    required to have robust epidemiological evidence.  As Sir

17    Bradford Hill used to say, you got to have a clear-cut

18    association before you even start looking at mechanism of

19    action.

10:13:46  20         What do we have here?  The famous hierarchy of

21    scientific evidence.  In this case, you primarily see in the

22    complaints a reference to adverse event reports.  MedWatches

23    involving the drug Suboxone.  That was the basis for the

24    label change in 2022.  We know that adverse event reports

10:14:06  25    are the lowest level of scientific evidence.  The plaintiffs

1    have been provided exemplars of some of these MedWatches

2    that the company has received.  You can see they're just a

3    few lines long.  They talked about someone having a prior

4    history of dental caries, tooth loss.  They took the drug

10:14:25 5    for a few months and have some more dental caries, and they

6    don't know what to do about that.

7         If you add up all of the ones in the complaints that

8    they have listed in their search from the FDA database,

9    there's 146 over a long period of time, about 13 to 14

10:14:38 10   years.  So we're looking at something about ten adverse

11   event reports a year that the plaintiffs have pulled from

12   the FDA website.  Ten a year for a drug -- and it says over

13   a million people take it per year over the last few years is

14   not -- definitely not evidence of causation, not even a

10:14:54 15   signal to get ten reports of dental caries and tooth loss

16   from the most prevalent disease in a population that's

17   already at risk of that.

18        They also have this letter to the editor, which is a

19   purported retrospective database study.  It's been highly

10:15:12 20   criticized primarily because the comparative groups with the

21   Suboxone users, which are prescribed for opioid use

22   disorder, were compared to two other drugs that aren't used

23   to treat opioid use disorder.  So the comparative groups

24   were not at all equivalent.  And there are also many, many

10:15:32 25   other criticisms of that study.

1      So what do the plaintiffs do with this status of the

2  evidence?  What they've said is, "We don't need any

3  epidemiology.  We know what the mechanism is.  We have a

4  plausible mechanism here.  So let's just go straight to

10:15:50  5  that."

6      The problem is -- and then they list -- they say, "We

7  all know that acid erodes teeth.  And then they included 29

8  mechanistic studies where teeth are extracted from animals

9  and from people, they're soaked in Coca-Cola or Gatorade for

10:16:08 10  days, weeks, and months, and then they measure it out and

11  say, "Yeah, there's some demineralization here."

12      The problem with that is that none of those 29 studies

13  have anything to do with Suboxone film.  And more

14  importantly, the studies don't have to do with the mechanism

10:16:23 15  of development of caries.  What we know from the science,

16  from textbooks, from the experts, and from the plaintiffs'

17  own cited literature is that erosion and caries are two

18  clinically distinct lesions.

19      With caries, you're dealing with -- where it requires

10:16:43 20  bacteria, primarily, streptococcus mutans or S.mutans.  That

21  is a requirement for caries mechanism.  It drills into a

22  certain part of the -- localized part of the tooth, and it

23  demineralizes subsurface enamel.

24      Erosion is only on the outside enamel, the surface

10:17:05 25  level enamel erosion.  There's no bacteria involvement, and

1    it's widespread.  You can see here a couple of examples.  On

2    the erosion side, you see it's affecting all the teeth.

3    They are smooth, this glaze color.  They have this thing

4    called rounded cusps.  That's just from the outside acid in

10:17:29  5    the mouth that erodes the outside level of the enamel.

6         On the caries side, you see the outside enamel is

7    still intact.  But the cavities are where the bacteria goes

8    into the inside subsurface level and demineralizes at that

9    level.

10:17:45 10         They are completely different mechanisms, Your Honor.

11    And even the very first study that the plaintiffs cite from

12    the '60s -- this has been know for a long time -- that

13    erosion and dental caries are different and require a

14    separate study.

10:18:00 15         Even if the plaintiffs say, "Well, we have some

16    plaintiffs that are going to allege acid erosion from

17    Suboxone film and not dental caries, you would still have

18    some of the same issues that you would have with dental

19    caries in that there's multiple exposures that people deal

10:18:15 20    with every day with acidic levels, including food and all

21    these different beverages that are well below what's

22    considered the critical pH level of 5.5.

23         But even in -- and also, this multiple -- same as

24    dental caries, there's multiple different factors involved

10:18:36 25    with erosion that cause or contribute to dental erosion.

1          Something that deals with both dental erosion and

2     dental caries is this very important issue in this case,

3     frequency and duration.  Both important on either acid

4     erosion or dental caries.

10:18:56  5          With respect to Suboxone film, it's indicated for a

6     single daily dose.  They're going to have plaintiffs, I'm

7     sure -- some doctors, because of plaintiffs' needs, may have

8     been prescribed more than a single daily dose, but that's

9     what we're indicated for.

10:19:13 10          Significantly, once you place that film in the mouth,

11    it dissolves within about 3 minutes.  There'll be lots of

12    clinical data provided on this issue.  There's a randomized

13    control trial that specifically looked at the dissolution of

14    film and found a mean of 173 seconds, which is just shy of 3

10:19:30 15    minutes.

16          Finally, back quickly to the acid erosion, their issue

17    of remineralization is important to keep in mind because

18    even if you bought into the fact that 3 minutes exposure to

19    this small film caused any acidic erosion, the other 23

10:19:49 20    hours, 57 minutes of the day, your saliva is remineralizing

21    any teeth that need it.  So we don't think that they've

22    shown any mechanism with respect to dental caries.  There's

23    problems with the mechanism because it's acidic erosion.

24          The last point, Your Honor, that they hit is they say

10:20:09 25    that this label change that was made in 2022, that went into

1    the Section 5, Warnings and Precautions section of the

2    label, supports their theory of general causation.  And they

3    cite, as all plaintiffs do, to the regulations that say,

4    "requires a reasonable evidence of causal association."  But

10:20:26    5    they leave off the rest of the sentence that says -- the

6    rest of the sentence, which says, "causation need not be

7    definitively established."

8          We also cited to --

9               THE COURT:  I mean, so one of the questions

10:20:36 10    I've had for the defendants on this issue is whether you

11    dispute an association.

12               MR. CHRISTIAN:  I would dispute even an -- I

13    mean, an association that they've been reported.  But that's

14    the only extent to an association with dental caries.

10:20:51 15               THE COURT:  I know.  Association is not

16    causation, so that's why we're here.

17          But I'm just asking as a predicate matter if there's

18    agreement, at least that there's an established association.

19               MR. CHRISTIAN:  Not any more than the fact

10:21:03 20    that people that take this drug have reported dental caries.

21          So with respect to the warnings, Your Honor, we've

22    cited to lots of law, including Judge Caldwell, that there's

23    a different standard between when the FDA decides to put a

24    warning in and legal causation.

10:21:20 25          And then finally, when the FDA does put in the

1    wording, they do characterize, I believe, the level of risk

2    that they see.  And you can see from the Suboxone film

3    prescribing information, that when there is a higher level

4    of evidence with some of these other risks of the drug, they

10:21:37  5    put in words like "can cause, increase the risk."  But

6    always, the -- when the FDA thinks it's the lowest level of

7    evidence available, they use the term "have been reported."

8    And that's all they're saying about dental caries, is that

9    they have been reported.

10:21:52  10         So in conclusion, Your Honor, we go back to where we

11    kind of started.  We think that we should look at these

12    thousands of medical doctors who are on the frontlines in

13    treating people with opioid addiction every day with what's

14    considered the gold standard treatment, this drug.  And the

10:22:11  15    11 medical associations --

16              THE COURT:  Some physicians I know would think

17    Vivitrol is the gold standard.

18              MR. CHRISTIAN:  Vivitrol?

19         Well, the WHO and several other ones consider this and

10:22:23  20    methadone the gold standard, but there certainly could be --

21              THE COURT:  I think there's hot debate in the

22    treatment community about medically assisted treatment, and

23    then even within MAT, which is the preferred --

24              MR. CHRISTIAN:  All right.

10:22:34  25              THE COURT:  -- approach.

14

1          MR. CHRISTIAN:  We think that we owe it to

2     these doctors who took the time to write this letter to the

3     FDA and say, "Your conclusion on causation is flawed."  We

4     think it we owe it to them to front-load this issue in this

10:22:48  5     case and go forward and make an early decision on that.

6          Thank you, Your Honor.

7          MS. SLETVOLD:  Good morning, Your Honor.  May

8     it please the Court:

9          I'll get switched over to my PowerPoint.

10:23:06 10          Well, Your Honor, we are, as the plaintiffs, always

11     understanding and happy to carry our burden of coming

12     forward with evidence.  We understand this case is no

13     different than any other.

14          But when we are talking -- our concern relates to how

10:23:22 15     this MDL rolls out over time if we go in the direction that

16     defendants are proposing at this point.

17          At this point, there is no science that I'm aware of

18     on which defendants could rely, or that their experts could

19     rely on, or that our experts would have to deal with, that

10:23:40 20     disputes the conclusions that we've drawn.

21          Let me -- let me start with the evidence that we

22     submitted to you, examples of how it's been understood

23     within the medical community and the dental community for

24     years, the impact of acid on teeth.

10:23:57 25          And the question that the Court is going to have to

1    answer at this stage of Rule 702 and 56, which is not the

2    stage where we are, and certainly not what we were aiming to

3    surpass at the pleading stage, the Court's going to have to

4    ask the question, can this happen?  That is the general

10:24:16  5    causation question.  Can we go from the picture on the left

6    to the picture on the right with the use of Suboxone film?

7         I don't know why defendants seem to be operating under

8    the misconception that this is a case about caries or

9    cavities.  I have certainly never represented that.  When

10:24:36  10   Your Honor raised the issue of jurisdictional minimums at

11   the first status conference, I thought I'd made very clear

12   that we understand what we need to achieve diversity

13   jurisdiction and to remain in this court.  And to the extent

14   anyone's filing some caries cases alone, I would certainly

10:24:55  15   like to talk with them.

16        But that is not what we're here about.  We're here

17   about the fact that the acidic products, Suboxone film,

18   erodes people's teeth and takes people from the picture on

19   the left to the picture on the right.  Now, within a general

10:25:10  20   causation paradigm, we aren't talking about in a vacuum

21   differential diagnosis for every possible confounder or

22   comorbidity.  We aren't talking about -- anytime we start

23   talking about some other factor that might be involved,

24   that's specific causation.  That needs to have a plaintiff

10:25:28  25   there so we can explore what precise circumstances that

1    person was under.

2        When we're talking about demonstrating general

3    causation and can this happen, we are talking about a

4    plaintiff where we're going to have to assume consistent and

10:25:41  5    recommended dental care was maintained.  So someone who --

6    you know, we have clients along these lines.  And this is

7    the type of client that we would be presuming for purposes

8    of general causation.  A client who was prescribed opioids

9    following a double mastectomy, who had some difficulty

10:26:01 10    ceasing the opioids, was transitioned immediately to

11    buprenorphine, and throughout that, never had a period of

12    illicit drug use, never had a time when they were not, you

13    know, engaging in the normal activities of daily life

14    consistent with oral hygiene, who, like I'm sure we all do,

10:26:19 15    floss twice a day, maybe three times, once after every meal.

16        This is the plaintiff that we would be looking at if

17    we're trying to determine, can this happen.  Controlling for

18    all other factors.  Can daily acid baths, often multiple

19    times a day acid baths, lead from the picture on the left to

10:26:36 20    the picture on the right?  It's been established and agreed

21    for years that acid has this impact on dental enamel.  We

22    cite studies throughout the last six decades that confirm

23    this.  And the product itself is designed to be acidic.

24                THE COURT:  Under the general versus specific

10:26:56 25    causation heading you're discussion now, do we have to have

1    any representative or exemplar individuals or plaintiffs to

2    deal with confounding factors, or any of the other Hill

3    criteria that might come to bear on the general causation

4    inquiry?

10:27:17  5              MS. SLETVOLD:  In the general -- can this

6    happen is a question about whether this product can lead to

7    the demineralization and destruction of teeth.

8              THE COURT:  But can you make that

9    determination in the abstract ultimately, or do you need to

10:27:28 10   make it in the context of specific real-world examples?

11             MS. SLETVOLD:  For it to be of any use in

12   advancing the progress of this MDL, we think it makes sense

13   to do it through a bellwether process.  So I think --

14             THE COURT:  But -- yeah, and I'm not asking

10:27:40 15   that.  I'm just asking as a scientific matter.

16             MS. SLETVOLD:  It would be theoretical.  In a

17   vacuum, can this cause that?  Can you get from the picture

18   on the left to the picture on the right?

19        And in that context, you don't have to assume any

10:27:53 20   potential other reasons that -- alternative cause is an

21   issue for specific causation, not general.  I certainly

22   wouldn't relish the notation of having to prepare expert

23   reports that attempt to differentiate or rule out

24   hypothetical confounders in people that are hypothetical.

10:28:12 25        This is a lot of -- that creates some gaps that are

1    not useful.  The process by which we get these cases ready

2    for trial is to get them ready for trial.  The experts are

3    to testify at trial about what's happening with general and

4    specific causation.  So asking them to do only a portion of

10:28:31  5    their work not only makes it more difficult to sort of

6    administratively complete that work, but also then requires

7    us to go back and work with them all over again after that

8    initial process is completed.  It puts delay and chaos into

9    the process because we aren't able to anticipate for all of

10:28:51 10    the potential things that might come up when we finally get

11    to specific causation.

12          Working through this process of developing expert

13    reports in the context of having actual plaintiffs whose

14    cases we're working out that are representative of the

10:29:07 15    different types of injuries that we're looking at here makes

16    the process more focused and organized for everyone.  Rather

17    than learning months down the road that there's some

18    additional issue that maybe we should have thought of, but

19    some of the plaintiffs that we -- you know, none of the

10:29:22 20    hypothetical plaintiffs we conceived of had this particular

21    issue.

22          So it really leaves us at a point where it's a moving

23    target because we're not quite sure where exactly we're

24    supposed to be going.

10:29:37 25          But the formulation and the design of this product is

1    to be acidic and have the effects of acid within the oral

2    cavity.  So the -- again, the buprenorphine is the active

3    ingredient.  The naloxone is there as a anti-diversion

4    mechanism.  It's not therapeutic to the product.  So the

10:29:56 5    idea is to absorb the buprenorphine and not the naloxone.

6    And to make that happen, according to the defendants'

7    patent, they are aiming for a pH of somewhere between 2 and

8    4, ideally 3.5.  But we see that the citric acid is included

9    for that purpose.

10:30:16 10    The prescribing information, as you can see at the

11    top, indicates that citric acid is part of the product, and

12    citric acid behaves as citric acid does within any substance

13    or within any product.  And you can see at the bottom there,

14    defendants, again, according to their patent, are aiming to

10:30:36 15    a 2 to 4 pH range, but are hoping to land at 3.35, which is

16    within the realm of what their own -- it's Exhibit 1 to

17    their reply brief -- confirm can lead to rapid

18    demineralization of the teeth.

19    That's what we have here at the top of this next

10:30:52 20    slide.  Defendants' own evidence with which their experts

21    would need to deal in a -- in terms of are we looking at

22    something that can happen, relying on sound methodology and

23    reliable generally accepted scientific concepts.  We will

24    all be looking at that same information, which does include

10:31:10 25    the epidemiology that has been published thus far from

1   Mr. Etminan, as well as Dr. Suzuki's case report and case

2   series.

3       The evidence that is in the published record thus far

4   is consistent with plaintiffs' theory of causation here.

10:31:26  5   And so similar to the chart that defendants showed you, the

6   rainbow of the pH scale, Suboxone is in, again, that 2 to 4

7   range.  What we are looking for to maintain a healthy mouth

8   environment is a pH of 7, a neutral pH.

9       So what happens when -- you know, the reason that we

10:31:45  10  can drink coffee every day and not experience the

11  disintegration of our teeth is because in a normal context,

12  saliva comes in and neutralizes the acid that's presented by

13  the stimulus, whether it's a coffee, whether it's the

14  Suboxone film.  Saliva does the job of protecting our teeth,

10:32:08  15  of remineralizing -- you know, as I always like to agree

16  with Mr. Christian when I can.  And I agree that saliva

17  protects the teeth if there's saliva there.  And that's part

18  of the problem that we're dealing with here.  When this

19  product dissolves in the mouth, it is not consistent across

10:32:24  20  all plaintiffs, and all of our clients report different

21  amounts of time to dissolve.

22      Defendants point to their patent and indicate that

23  it's a three-minute dissolve time.  That was aspirational at

24  best because what SAMHSA -- which is responsible for getting

10:32:45  25  doctors set up to prescribe these drugs and to train them on

1    the use of the product -- according to SAMHSA's

2    buprenorphine start guide, it can take up to ten minutes for

3    this to dissolve.  But what our clients actually report, is

4    that it's anywhere from 10 to 30 minutes for the strip to

10:33:07    5    dissolve.  And there's this filmy taste and feeling in their

6    mouth for an hour or two thereafter.  So the notion that

7    this is a quick dissolve, one and done, out the door is not

8    consistent with the reality of how this medication is used

9    in public.

10:33:22    10           We're also not talking about, as Mr. Christian

11    suggests, a single daily exposure because this drug is not

12    administered once a day.  In the this is the medication

13    guide, or the prescribing information for Suboxone film,

14    that indicates that the maintenance treatment, which is the

10:33:41    15    long-term treatment that you engage in following the period

16    of stabilization from active opioid abuse, during the

17    maintenance period, the average target dose is 16 milligrams

18    a day.  There's not a dosage, there's not a film strip

19    that's 16 milligrams a day.  The dosages are below.  It's 2,

10:34:01    20    4, 8 and 12.  So everybody is getting more than one strip if

21    they're on a regular maintenance dose.

22           And even though it's indicated that a single daily

23    dose is what's happening, that's not the way it's used in

24    the world.  Multiple administrations daily, typically two,

10:34:15    25    but as many as three, depending on the client.

1    And I've got some examples of medical records from

2    some of our clients indicating that they are directed to

3    place the strip in the morning and in the afternoon.  So

4    that people are getting exposed to more than simply one

10:34:31  5    single daily dose of three meds.

6    And again, this gentleman here is prescribed two and a

7    half a day and is told to -- essentially being told to cut

8    them in half, which, again, is not consistent with looking

9    at the defendants' prescriber information, which says do not

10:34:48  10    cut.  But that's not what SAMHSA is teaching doctors about

11    how to treat these patients with this product.

12    Now, again, defendants are responsible for knowing how

13    their product is being used and the way it's being

14    administered.  So relying on the patent and the prescribing

10:35:03  15    information without actually realizing or appreciating and

16    acknowledging what's happening in the world is a problem

17    here because it's relevant to the amount of time these folks

18    are being exposed to this.

19    Now, how long is this acid bath for the teeth

10:35:20  20    continuing with the use of Suboxone film?  What the

21    manufacturers here are telling the doctors through the

22    prescribing information is you may need to use this

23    indefinitely.  There's no indication in the information

24    provided to doctors that there should be a sense of urgency

10:35:36  25    about tapering people for protection of their dental health

1    to avoid the disintegration of the teeth through erosion.

2        And again, Mr. Christian's Exhibit 1 to his reply

3    confirms that it's important to identify the effects of

4    dental erosion caused by long-term exposure to

10:35:56  5    pharmaceuticals.  And I don't see any published indication

6    that defendants have done that here with respect to this

7    drug, even though that is their obligation.

8        Now, I notice in the -- both the proposal and the

9    reply that there's -- you know, it's almost a yada yada of

10:36:15  10   the dental erosion issue, which, to me, is the corpus of the

11   case.  And this is how it happens.  It's basic chemistry.

12       You're looking at what happens in -- when there's an

13   acid challenge to teeth.  So the tooth is represented by the

14   blue, the CA compound is the molecule structure of dental

10:36:35  15   enamel.  And what happens when there's an acidic substance

16   in the mouth, it's the hydrogen ions that make a substance

17   acidic.  The presence of the hydrogen ions.  And hydrogen

18   ions do what hydrogen ions do in every context, which is

19   draw out those minerals.  They act like a magnet, they pull

10:36:52  20   out the calcium, and then that is weakening and softening

21   the enamel through that demineralization process.

22       And when we don't have a normal saliva flow to

23   neutralize and remineralize the teeth, we wind up with the

24   photo that I showed you at the beginning.  And it's

10:37:14  25   undisputed, even though I didn't see any reference in

1    defendants' reply to what we laid out in our opposition

2    regarding the xerostomic conditions that are faced by as --

3    based as a side effect of buprenorphine by many of our

4    clients and many of the users of this drug, dry mouth is the

10:37:35  5    side effect of the buprenorphine.

6        And so the plaintiffs and the users of this product

7    are in a position where their own bodies can't remineralize

8    the teeth as a result of the dose after dose of acidic

9    exposure to the film product.  And again, this goes back

10:37:52 10    decades.  There's no suggestion that the hydrogen from the

11    citric acid in Suboxone film behaves differently than any

12    other hydrogen ion in the world.  I'm unfamiliar with

13    anything on which someone could rely to say that.  And I'm

14    confident that we can present to the Court evidence that

10:38:10 15    will surpass the 702 burden as it relates to this very basic

16    chemistry.  This is not an analytical leap that needs to be

17    made about how acid impacts the teeth.

18        And what I want to note very specifically in relation

19    to the scientific article cited by defendants as their

10:38:29 20    Exhibit 1 to their reply, it was about a liquid bandage with

21    a pH of 4.67, and it was subjected to some testing using cow

22    teeth.  So I'm glad that we're all in agreement that we can

23    extrapolate to human causation from the use of bovine

24    dentition.  That's one less thing we'll have to fight about

10:38:51 25    through this litigation.

1       But what it determined as they were testing to see if

2    this bandage, the liquid bandage that they put on the soft

3    tissues of the mouth, has a negative impact because of its

4    acidity on the dentition, was that they used normal saliva

10:39:06   5    conditions.  So we don't dispute that in normal saliva

6    conditions, a pH of 4.67 isn't going to have the kind of

7    disintegration of the teeth through erosion that our clients

8    experienced.

9       But when you don't have normal saliva conditions --

10:39:23  10    and what they're doing here at this part of the article is

11    distinguishing from other tests that had found a risk of

12    erosion in the context of similar pH levels.  They used

13    artificial saliva to mimic the conditions of the mouth that

14    is not subjected to buprenorphine.  We don't have that here.

10:39:42  15    The extent and duration of those exposures coupled with the

16    absence of the mouth's natural ability to protect itself

17    through remineralization is why we don't think that there's

18    any reason to take a detour to address this issue at this

19    point.

10:39:59  20       So when our experts are asked, can this happen, can we

21    go from the picture on the left to the picture on the right

22    by daily acid baths in the absence of normal salivary

23    conditions, the answer is going to be yes.  And so we

24    shouldn't take a detour for that reason.

10:40:16  25       Now, from the standpoint of how one would even erect

1    such a process, I guess I'm a little bit unclear on

2    precisely what defendants' propose.  Their initial

3    proposal -- this is from their supplement which was filed a

4    couple of weeks after our last status that indicates what

10:40:38   5    they define as the scope of document discovery on general

6    causation.

7        In the original proposal, there was a final bullet

8    point that wanted a PPF process as it related to all

9    plaintiffs.  And there's some ambiguity as it relates to --

10:40:55  10    it's at page 20 of the -- well, page 16, 20 of 28, at the

11    top of Indivior's reply, that suggests that there's not an

12    attempt to refrain from discovery relating to specific

13    versus general causation.  So I guess I'm in some ways

14    unclear about what exactly is being proposed.  And when

10:41:14  15    we -- each time we have one of these questions about how

16    exactly are we going to define this, how exactly is this

17    workable, each of those questions takes more time and leads

18    to more briefing and leads to more delay versus just doing

19    what lawyers do and getting the case going and up and

10:41:30  20    running.

21        And that is what we did.  We took -- from the first

22    status, we took to heart your client's directive that we

23    should get going on this process to the extent we can.  And

24    Indivior had indicated at the first status conference that

10:41:44  25    it wished to propose a bifurcated process for front-loading

1    general causation.  And so through that lens, we submitted

2    production requests limited and targeted to the issues that

3    we thought that would be impossible to say, no, we can't do

4    this in a general causation framework.

10:42:04  5    So we laid out for you in our briefings some

6    hypothetical ways that it could go sideways.  But now we

7    don't have to speculate anymore because we know exactly

8    what's going to be going on with that process as we've seen

9    in their discovery responses.  So this is just a slight look

10:42:21 10    at the kinds of fights we're going to be having if we go in

11    this direction.

12    So defendants indicated a willingness to provide

13    documents about the clinical development of the product.

14    Kind of noncontroversial in a pharmaceutical case that we

10:42:36 15    would be receiving such documents.  It appears that all they

16    would like to produce regarding these are what they've given

17    to the FDA.  I think it would be -- it would be nice as a

18    defense lawyer to go, yes, prosecute this pharma case with

19    what I've shown the FDA and not with anything that I

10:42:54 20    haven't.  I don't imagine that the good stuff is in the

21    former rather than the latter.

22    So this is -- in terms of clinical development, all

23    they want to provide us with is what they showed the FDA.

24    That's going to be a fight right there because all they want

10:43:10 25    produce is -- let me go back here.

1          So they're being very specific about what clinical

2    development documents and things submitted to the FDA

3    they're willing to provide.  They're acknowledging they're

4    going to give us Suboxone tablet clinical development info

10:43:23  5    because, as they acknowledged, the film approval was based

6    on studies done in the tablet.  But it wasn't just based on

7    studies done in the Suboxone tablet.  As the prescribing

8    information confirms, the Subutex tablet, which is the

9    buprenorphine without naloxone -- similar product, but

10:43:40  10    without the naloxone component -- clinical trials using

11    Subutex were part of what led to approval of the film.  So

12    why would we exclude something that was part and parcel of

13    getting this product approved in the first place?

14          That's another example of a fight that we're going to

10:43:58  15    have.  Defendants are objecting to anything

16    buprenorphine-containing that they manufacture other than

17    Suboxone branded documents.  Well, what about Suboxone -- or

18    Sublocade injections?  It's buprenorphine extended release

19    injections.  It's been approved by the FDA for years.  And

10:44:15  20    in their dental safety communication in January of '22, the

21    FDA specifically pointed out that they had not identified a

22    dental concern risk as it related to this injection.  The

23    one that's not deposited in the mouth every day creating

24    acidic conditions.

10:44:30  25          So wouldn't clinical development documents related to

10:44:47

10:45:10

10:45:28

10:45:45

10:46:03

1    Sublocade tend to suggest comparatively that there are risks

2    associated with one and not the other?  That's certainly

3    relevant to the issue of general causation as it relates to

4    any buprenorphine user.  And that's not simply as it relates

5    to injections.  There's also a transdermal drug delivery

6    route for this particular product.  And any analysis of

7    this -- I mean, we see it in the Etminan JAMA letter that

8    they're comparing users of transdermal products as well.  If

9    we are going to be able to have a fair shake at conducting a

10   reasonable process, we need to see the same things that the

11   defendants have and what they're relying on to move forward.

12        As a drug manufacturer, they are in a position and

13   have an obligation to monitor for the safety of these drugs.

14   So when we ask them in production request 14, give us

15   documents regarding the relative safety of your

16   buprenorphine products, again, they object and say they only

17   want to give us what they've got on Suboxone that they've

18   already given to the FDA.  Again, this isn't -- I'm

19   certainly all in favor of an orderly and proper process.

20   But the idea of asking us to do this with one or both arms

21   tied behind our back is unfair.

22        And finally, as it relates to some of the problems

23   that we're already seeing in discovery, I don't know what

24   could be more fundamental to a phased or bifurcated

25   discovery process than documents about the existence of a

1       causal relationship between the product and the injuries

2       alleged.  But defendants start by getting tripped up at

3       dental problems -- we're not quite sure what that means --

4       and balk at the term "causal relationship."

10:46:17 5       But this is a highly regulated industry.  As the CFR,

6       which you see on the screen here, and multiple Supreme Court

7       precedence confirm, the manufacturer is the one that's got

8       the duty to monitor for safety signals, ensure that the

9       warning label is accurate and provides the information that

10:46:37 10      people need to know about using this drug.  And to pretend

11      that they don't understand what causal relationship means

12      when it is part of the regulations that govern their highly

13      regulated industry, the problems that we have with getting

14      to the discovery we need to do the case -- you know, this is

10:46:56 15      just some basic illustration of the way that this is going

16      to roll out problematically.  And we can go on.

17      But this is a final example that I'll give you.

18      Indivior simply refuses to respond about contracts that it's

19      got pertaining to functions about Suboxone film, like

10:47:16 20      somebody who is going to conduct a clinical trial or who has

21      conducted a clinical trial in relation to the product,

22      insisting that it is not limited to general causation.  We

23      have some concerns with that because if they've got somebody

24      outside conducting clinical trials that demonstrate exactly

10:47:32 25      what we say, bifurcating general causation and allowing them

1    to close off those avenues of evidence puts us at a

2    disadvantage, and we're trying to do 702 maybe even hogtied.

3         And finally, defendants, they've got a very special

4    letter that was the basis for their motion to phase

10:47:49  5    discovery in the first place.  Twelve days after the FDA

6    issued its safety communication mandating that a dental

7    damage warning be included on the label, this group of

8    medical associations, 11 of them, largely addiction

9    medicine -- I think all of them are addiction medicine, no

10:48:08 10    chemists, no pharmacologists, no toxicologists -- but

11    setting that aside.  Twelve days later, this group comes

12    forward and goes, there's no way to establish causation.

13    And based on that, defendants would like to send this MDL on

14    two or plus more year hiatus down a path that can be easily

10:48:30 15    tread in conjunction with the rest of the case, which is

16    what we need.

17         But pointing to this letter as a reason to conduct

18    only a small segment of the work that needs to be done here

19    but at the same time objecting that communications that led

10:48:44 20    to that letter the defendant had with those organizations

21    and its members are not relevant to general causation, how

22    stacked do we want this deck to be?

23         It's concerning to see that this is the initial

24    reaction to what we thought was a good-faith attempt to get

10:49:02 25    the process going, even as it related to what defendant

1    acknowledged it needed to do.  We're already at a point of

2    limited agreement and the need to have Court intervention to

3    get things moving along if this is the path on which we go.

4         I mean, regardless of what path we tread, having this

10:49:21    5    information and having this discovery in process is

6    certainly beneficial.  But what we're looking at here is

7    not -- you know, is not a reason to -- it's a reason not to

8    do it that we're going to have so many fights about it.

9         And I'll say one final thing.  When we -- and this is

10:49:38    10    a little bit of inside baseball on the way that the

11    plaintiffs' side works in these contexts.  I mean, we

12    essentially make a new law firm every time there's an MDL.

13    And it's a law firm comprised of firms all over the country.

14         And we love our team here.  We have, you know -- and

10:49:57    15    much like in any big law firm, we've got certain people who

16    do certain things, who tend to work on certain aspects of

17    the case and not others.  We've got folks who work on

18    experts, folks who focus on a bellwether PPF process, folks

19    who do law and briefing.  There's a wide variety of folks.

10:50:12    20    And we have people prepared to do all that work.  And

21    they've committed to the Court in asking to be appointed,

22    that they are ready, willing, and able to do that work.  And

23    so with all those buckets, we've got covered with our

24    vendors assembled here.

10:50:26    25         But if we tell large chunks of that team, we're not

1    going to need you for, like, a year or two or maybe more and

2    then we're going to come back to you at some point, we can't

3    expect reasonably that these folks are just going to have

4    sat there and waited.  They're going to fill that time.

10:50:43  5    They're holding it now because we're ready to go.  But we --

6    it's unfair, it's prejudicial to us if our team doesn't get

7    to work on what we're prepared to work on because we're

8    going to have some attrition.  It's just sort of the nature

9    of the way that the work goes.  If we don't engage people,

10:51:00  10   then their availability at the time that we need them is

11   going to be limited, which further stacks the deck against

12   us.

13        Absent any questions from the Court, I'm happy to sit

14   down.

10:51:10  15             THE COURT:  One question I had was in the

16   defendants' supplement filed at the end of April,

17   April 23rd, they had expressed some willingness, or at least

18   a lack of objection to proceeding with a handful of

19   individual plaintiffs to work up in conjunction with general

10:51:33  20   causation.  And I'm not sure I saw a response to that in the

21   plaintiffs' submission.

22        So it what's the plaintiffs' position on that?

23             MS. SLETVOLD:  Well, it was our understanding

24   when Indivior filed its supplement and removed the request

10:51:48  25   to have a PPF process, that it was not any longer in wanting

34

1    to have any kind of bellwether.  I mean, that's what I would

2    just call it.  Whether we call them --

3              THE COURT:  Well, I mean, what they said is,

4    "Indivior is agreeable to a process where the Court randomly

10:52:03  5    selects three to five plaintiffs to be included in the

6    general causation phase discovery."

7              MS. SLETVOLD:  And I'm not quite sure what

8    that means.  It's a set of questions that it creates.  How

9    would that be drawn?  Where would we draw them from?

10:52:16 10    I mean, and by contrast versus some sort of amorphous

11    suggestion, we have proposed a concrete bellwether protocol

12    that would focus exclusively on Ohio.

13          Obviously, we have a large number of plaintiffs

14    already filed and more to be -- you know, more to become

10:52:31 15    revealed to the Court at the end of next week when we file

16    our schedule and complaint.

17          What we've proposed is a process where we focus on the

18    state of Ohio, where the Court could sit as trial judge,

19    regardless of whether we're northern/southern because we're

10:52:47 20    within the state, and then we've at least got a smaller

21    pool.  We certainly have enough of the opioid crisis here in

22    Ohio.  It's been a hotbed, as the JPML has acknowledged,

23    first in sending the opioids MDL here, as well as this sort

24    of -- as well as this MDL.  And we've got a corpus of people

10:53:03 25    from which we can do that kind of workup.  What we are

1      proposing is precisely the notation of working up cases for

2      trial while we do all the other things.  As I've said

3      before, we can walk and chew gum and spin plates and juggle

4      knives.  Like, we've got this.  We're ready to go with this

5      process.

6          But artificially delaying some aspect of the case

7      to -- simply because there are some addiction medicine

8      doctors who disagree with the chemistry that we've

9      presented, it doesn't seem like the way to proceed with an

10:53:38 10      efficient -- and getting us ready for the trials that we

11      want to have.

12              THE COURT:  All right.  Thank you.

13          Mr. Christian, any rebuttal?

14              MR. CHRISTIAN:  I think we've made it through

10:53:51 15      the whole agenda on plaintiffs' presentation for today.

16          But just a couple of points on the general causation,

17      Your Honor.  Number one, this drug was not designed to be

18      acidic.  If you'll see through the patent, and you'll see

19      through FDA communications, we were required to show

10:54:06 20      bioequivalence to the tablet to get approval for the film.

21      And we actually tested -- and it's in that patent -- all

22      different types of pH levels that are put on the film.  And

23      when we tested higher pH levels, 5.5, 6 and above, it did

24      not equate to a bioequivalence of the drug and to the

10:54:27 25      patients' bodies.  So in order to get approval for Suboxone

1        film, there's a reason why there's a 3.5 acidic level

2        because that's what administers the active dose of the drug

3        to do its job.

4            I don't think we need to -- you know, the SAMHSA

10:54:48   5        thing, they talk about tablets, and the tablets do take 10

6        to 15 minutes to dissolve.  But this litigation is about

7        Suboxone film, which they'll be plenty of data, randomized

8        controlled trials talking about a much shorter time period

9        than that, and we can rely upon that.

10:55:07  10            And then I think most significantly is the fact that

11        they did not address what is just pure science, that the two

12        distinct mechanisms between acid erosion and dental caries,

13        they are distinct.  It's in textbooks.  The leading textbook

14        for dental caries talks about the two distinct lesions.

10:55:25  15        They just try to mesh in acid erosion.  If they're giving up

16        on any kind of dental cavities and tooth loss from dental

17        cavities and only going to do acid erosion, that's a whole

18        different injury.  And that's fine.  But if they're going to

19        have an expert that's going to come in here and say acid

10:55:42  20        erosion results in dental caries and subsequent tooth loss,

21        that's going to turn science on its head, and we should

22        definitely front-load that issue.

23            And I think to the extent -- I think we can work out

24        the discovery, Your Honor.  This was our first set of

10:55:56  25        responses last week.  We just had a first meet and confer

1    this week.  To the extent we want to get into more details

2    about what we're willing to do, we can do that later today.

3           But that's it on the proposal.

4           THE COURT:  With respect to the discovery, I

10:56:13  5    don't really intend to get into that today for two reasons.

6    But the practical one is I didn't even see the email until

7    this morning, since I was traveling the last couple of days.

8           The second is based on my very quick review earlier

9    today, it seemed like the issue related more to we needed to

10:56:34 10    get past this set of issues first, and then I think that

11    will provide some clarity on the direction.  That may not

12    resolve all the issues.  I would anticipate it won't.  But I

13    think it may provide some clarity once we resolve the

14    defendants' proposal.

10:56:52 15           I guess I just, on the proposal, you know, just wanted

16    to ask some practical questions of each side.

17           And I think, you know, for the defendants first, I

18    know that you and your client, as we sit here today, are

19    optimistic and bullish on the science.  But if that turns

10:57:23 20    out not to be the case, I mean, does your client really want

21    a ruling out there under 702 or 56, or both that says that

22    their product can cause these serious injuries?

23           MR. CHRISTIAN:  Yes, Your Honor.  If that's

24    your determination after going through this, we totally

10:57:42 25    accept it.  If they're able to show that there is scientific

1    reliable evidence of general causation, then we will accept

2    Your Honor's decision on that.

3              THE COURT:  And I guess on the flip side of

4    that, on the plaintiffs' side, as I hear you saying you're

10:57:59  5    ready to go, and you've got the big team and so forth.  But

6    regardless of the state of the science, even if the state of

7    the science there was general agreement on -- and I take the

8    point that there's not, it's all highly contested at this

9    point -- it's still hard to prove general causation for

10:58:19  10    plaintiffs.  And it's expensive and time-consuming.

11         So why not limit the investment up front, kind of take

12    them one step at a time?  There's going to be fights about

13    discovery on that, I get that.  But there's going to be

14    fights about discovery whatever we do.  So why not limit the

10:58:38  15    resources and deal with the threshold question that's going

16    to have some general applicability?

17              MS. SLETVOLD:  Because it doesn't limit the

18    resources.  It requires us -- because we are not concerned

19    that we lack scientific basis grounded in hard chemistry

10:58:54  20    that hydrogen ions do what hydrogen ions do to teeth.

21         And so through that prism, if we're talking about

22    going through a two-year intellectual exercise and are still

23    no closer to getting ready for trial, that doesn't save us

24    any time or money.  I mean, we wouldn't have come forward

10:59:13  25    with the case if we were questioning whether there was a

1  scientific basis to conclude that prolonged exposure to acid

2  erodes teeth and causes the devastation that our clients

3  have experienced.  We've already gone through that

4  intellectual exercise before coming forward with the case.

10:59:30  5  And so the idea of sending us on a detour, sidelining

6  much of our team without having anything for them to do to

7  be actively moving the case to get it ready for trial, the

8  delay that would result is something that not only we, but

9  our clients don't want to wait an extra two years to have

10:59:49  10  gone through this part of the process.  That's just not

11  something that enures to the benefit of the people that are

12  here asking this Court to solve the problem that they've

13  experienced as a result of taking this drug.

14  THE COURT:  All right.  Thank you.

11:00:04  15  So with respect to the defendants' proposal, I

16  appreciate your arguments.  I'll take them under advisement.

17  I'll get you a ruling as promptly as I can.  Ordinarily, I

18  would probably say I'll do everything I can to get it to you

19  next week.  Next week's not a good week for me, so it will

11:00:21  20  slide into the following week, I'm highly confident of.  But

21  I'll try to get it to you week after next, barring, you

22  know, the typical emergencies that arise.  I'll do my best

23  to get it to you promptly.

24  There's a few other things on the agenda today from my

11:00:38  25  perspective.  But I think it would make sense to talk about

1    those in chambers, or in the jury room, more accurately.

2         So why don't we take a short break and then reconvene

3    there.  I was going to say, at the top of the hour, but

4    that's now.  So maybe in ten minutes.

11:00:58  5              COURTROOM DEPUTY:  All rise.

6                          - - -

7              (Proceedings concluded at 11:01 a.m. )

8

9

10                    **C E R T I F I C A T E**

11

12         I certify that the foregoing is a correct transcript

13    from the record of proceedings in the above-entitled matter.

14

15

16    */s/ Donnalee Cotone            11th of June, 2024*
      DONNALEE COTONE, RMR, CRR, CRC                 DATE
17    Realtime Systems Administrator

18

19

20

21

22

23

24

25